```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   TREASURE CHEST THEMED VALUE
     MAIL, INC.,
 4
                        Plaintiff,
 5
                  v.                              17 CV 1 (NRB)
 6
     DAVID MORRIS INTERNATIONAL,
 7   INC.,

 8                      Defendant.

 9   ------------------------------x
                                          New York, N.Y.
10                                        April 17, 2018
                                          2:45 p.m.
11
     Before:
12
                        HON. NAOMI REICE BUCHWALD,
13
                                                District Judge
14
                              APPEARANCES
15
     KNOX LAW GROUP, P.C.
16        Attorneys for Plaintiff
     BY:  DANIEL KNOX
17
     LEHMAN LAW GROUP LLC
18        Attorneys for Defendant
     BY:  BRIAN LEHMAN
19        JULIE SOLARZ

20

21

22

23

24

25
```

1      (Case called)

2      THE DEPUTY CLERK: Is the plaintiff present and ready

3 to proceed?

4      MR. KNOX: Yes.

5      THE COURT: State your name for the record, please.

6      MR. KNOX: Daniel Knox, Knox Law Group.

7      THE COURT: Is the defendant present and ready to

8 proceed?

9      MR. LEHMAN: Yes. Brian Lehman and Julie Solarz from

10 Lehman Law Group LLC.

11      THE COURT: We scheduled this conference a few weeks

12 ago and issued an order with respect to this conference on the

13 10th of April. The purpose of the conference is to see if we

14 can sort of jointly cut through the underlying issue in the

15 case which is essentially raised by the defendant in which the

16 defendant asserts justifies their failure to pay the claim of

17 Treasure Chest.

18      And to put it succinctly and not necessarily in the

19 exact language of the parties, the defendant's position is that

20 they were promised a targeted list for their product of

21 vacation packages, and since they received no business after

22 the mailing, they've raised the issue of whether the list was

23 really targeted or not.

24      So I'm hopeful that we can learn from plaintiff's

25 counsel. Demonstrate to me and to the defendant how the

1   plaintiff goes through this list of names that it has to

2   ascertain which individuals are good targets for the mailing.

3           So I asked that you bring ten hard copy sheets.  Let's

4   also make one thing very clear.  I don't think anybody --

5   defendants, certainly not me -- has any interest in learning,

6   retaining any piece of information that the plaintiff describes

7   as a trade secret.

8           I'm not going into the business of mailing.  I don't

9   think defense counsel is going into the business of mailing.

10  Besides, if you showed me a list of 30 names and then turned

11  them over, unless I concentrated on one, I couldn't recite the

12  others.  So this is not material that one can retain.  So I

13  don't think we ought to be concerned about there being some

14  invasion of plaintiff's proprietary interests.

15          So can you show me those ten sheets.

16          MR. KNOX:  May I step up?

17          THE COURT:  Do you have copies for the defendant?

18          MR. KNOX:  I did not bring copies for the defendant.

19  I brought copies for the Court's view.  I apologize for not

20  bringing a second copy.

21          THE COURT:  Why don't we make a copy so we can all

22  talk about the same thing.  We'll give you back all the copies

23  at the end.

24          MR. KNOX:  All right.

25          (Pause)

1        THE COURT:  So, Mr. Knox, let's just start with the

2    first page.  We'll just say the woman named Stephanie.  Okay?

3        MR. KNOX:  Okay.

4        THE COURT:  I can tell that's a name.  So the columns

5    are the address.  The fourth is a ZIP code; right?  The second

6    from the right.

7        MR. KNOX:  Yes.

8        THE COURT:  Can you explain what is the last column.

9        MR. KNOX:  The last column is just the additional four

10   digits of the ZIP code.

11       THE COURT:  So then how does this list in any way

12   distinguish between -- let me go back.

13       This is the list or part of the list from which the

14   plaintiff selects names to send ads, little inserts, for the

15   defendant's product.  Right?

16       MR. KNOX:  Correct.

17       THE COURT:  How would you use this list to target

18   recipients of defendant's advertisement?

19       MR. KNOX:  The list itself is comprised of individuals

20   who have sort of opted in.  So by way of sending postcards back

21   to my client, signing up online to receive ads in the mail for

22   travel-related materials.  It's not a list where specific names

23   are selected there from for targeting.  Every individual on

24   this list has opted in to receive advertising material related

25   to travel.

1      THE COURT:  I asked for ten pages.

2          In hard-copy terms, how many pages long is your

3  client's list?  Let me go back.

4          These are ten pages of a list which is kept on a

5  computer; correct?

6      MR. KNOX:  I believe so.  This particular list -- the

7  list was sent to me by my client's third-party IT, so to speak.

8  So they store it and sent it over.  So it's not just a file

9  that's sitting on a laptop belonging to my client.

10     THE COURT:  Where is the file?  Where is the list

11 kept?

12     MR. KNOX:  It was sent to me by a third party.  I have

13 a copy at this point, but my client himself did not have one on

14 his laptop at the time.

15     THE COURT:  So some other company maintains Treasure

16 Chest's list?  Or some other company has its own list?  Let me

17 just ask that question.

18     MR. KNOX:  Well, it's Treasure Chest's list.  The list

19 itself derives from individuals and families sending

20 information directly to my client.  And there is also a portion

21 of the list that was purchased by outside sources.

22     THE COURT:  How many names in total are on this list?

23     MR. KNOX:  I can't say exactly.  I was looking at it

24 this morning.  So it's 1,000,040 plus.

25     THE COURT:  These ten pages are printouts from a list

1    of over a million names; correct?

2              MR. KNOX:  Yes.

3              THE COURT:  And are all of the names on the

4    million-plus list people who have expressed an interest in

5    receiving travel packages?

6              MR. KNOX:  Yes.  That's the way my client explained it

7    to me.

8              THE COURT:  So that means that your client also has

9    other lists that are totally distinct in which people have

10   expressed an interest in some other endeavor?

11             MR. KNOX:  No.  My client's business is specifically

12   related to the travel industry.  Essentially this list is his

13   business.

14             THE COURT:  Are there any other columns in this list

15   that have not been reproduced on this spreadsheet that you gave

16   me?

17             MR. KNOX:  No.

18             THE COURT:  Exactly how did your client compile this

19   list?

20             MR. KNOX:  It's from several different forms, so to

21   speak.  There are individuals who sign up on the website to

22   receive like a chance to enter a sweepstakes and to receive

23   travel-related advertisements.

24             There are hard-copy cards, postcards, that were filled

25   out and sent back to him with the same information.  And there

1   are also a portion of it that was purchased from other similar

2   sources, so to speak, like magazines, travel magazines, that

3   operated the same way.  Those names were purchased from them,

4   and ultimately it was compiled into this list.

5            THE COURT:  How long has your client been in business?

6            MR. KNOX:  I believe it's over 20 years.  I can't say

7   for certain at the moment.

8            THE COURT:  But a considerable amount of time?

9            MR. KNOX:  Yes.

10           MR. LEHMAN:  On his website it says 1991 I believe.

11           THE COURT:  Okay.

12           MR. KNOX:  If it's helpful, my client also has larger

13  clients like Carnival Cruises and other large businesses of the

14  sort.

15           THE COURT:  So this list targets people who are

16  interested broadly in travel or targets people that are

17  interested in cruises?

18           MR. KNOX:  I believe it's travel in general, but

19  that's the majority of my client's clients are cruise lines.

20           THE COURT:  If this is the totality of the information

21  that your client maintains, there is no method for

22  differentiating between various people on the list for one

23  purpose or another?

24           MR. KNOX:  No.  I don't believe so.

25           THE COURT:  Mr. Lehman, do you have any other

1    questions about this list which I failed to ask which of course

2    could happen?

3           MR. LEHMAN:  Maybe two.  The first would be was this

4    the only list that was used for the purpose of benefiting my

5    client?  Were there other lists floating out there?

6           MR. KNOX:  No.  This is the spring 2016 list that was

7    used.  This is what was contracted in the contract, and this is

8    the only list for that period of time.

9           MR. LEHMAN:  The second question is:  Where are the

10   emails?  Because we get a reply card that they produced in

11   discovery that they list the emails on there.  There are no

12   emails on this list, and when you sign up on the website, it's

13   signed up through emails, and they ask you a series of

14   questions.

15          MS. SOLARZ:  As part of the contract, I believe it was

16   guaranteed 300,000 minimum followup of weekly digital

17   impressions.  So there would have been some type of email

18   component.

19          THE COURT:  Could I see what you're referring to.

20          Let me sort of learn more.  First, what is this

21   postcard?

22          MR. KNOX:  The postcard is something that a consumer

23   could send back in order to be included --

24          THE COURT:  How would the consumer get this?

25          MR. KNOX:  They get it in a mailing which is the

1    envelope that you were provided with.

2            THE COURT:  In other words, someone who has not asked

3    to receive this mailing?

4            MR. KNOX:  No.  It would be the names from the list.

5            THE COURT:  Wait a second.  That kind of goes both

6    ways.  I thought that you said --

7            MR. KNOX:  Your Honor, I believe I understand the

8    question.  When an individual on the list receives the

9    advertisement, they also receive a postcard where they can

10   actually sign up friends and family, so to speak.

11           THE COURT:  Okay.  So the postcard is inside this

12   envelope.

13           MR. KNOX:  Yes.

14           THE COURT:  With these various glossy pages.

15           MR. KNOX:  Yes.  Those would be the other companies

16   that are participating in that same season's campaign.

17           THE COURT:  But all these materials have been sent to

18   somebody who has already expressed interest in travel?

19           MR. KNOX:  Yes.  And that's exactly what the list is.

20   It's what the list is comprised of.

21           THE COURT:  But what mechanism do you use to get the

22   list in the first place?  In other words, this is what you're

23   sending to people that are already on your list.

24           How do you get the list?  Not the one you purchase,

25   but you said before that it's comprised of people who have sent

1    back postcards I assume like this.

2                MR. KNOX:  Right.

3                THE COURT:  Now you're saying that this envelope would

4    have been sent to somebody who was already on the list.  So the

5    postcard doesn't expand your list.

6                MR. KNOX:  I'm sorry if I was confusing before.

7    Nonetheless, I can't tell you where the list originally came

8    from from day one.  That information I don't have, but I know

9    that certain portions were purchased from existing magazines,

10   from my client compiling the list, from opt-ins, and it was

11   also opted in online.

12               So essentially it boils down to, as far as the opt-ins

13   go, running a sweepstakes online on the website, if you want to

14   enter for a chance to win a free three-night vacation to this

15   point.  In addition to that, they would opt in to the mailing

16   list thereafter.

17               THE COURT:  Okay.

18               MR. LEHMAN:  Your Honor, my question is:  Where are

19   the emails?  Because when you opt in online, you only opt in

20   with emails, or you opt in with both your address and your

21   emails, but from what I've seen, you only opt in with emails.

22   So we have a complete list here.  There are numerous other

23   questions I could ask.  The first question is:  Where are the

24   emails that people sent to you when they opted in to your

25   sweepstakes and on the postcard?

1    MR. KNOX:  To that I would say if there's been an

2    oversight on this, I would have to confer with my client.  This

3    is exactly what I received.  I just received it yesterday in

4    preparation for today.  If there is anything else, I would

5    actually have to ask my client as far as specific emails.

6    MR. LEHMAN:  That's the moving target that I have been

7    facing.  When I ask inquisitive or what I consider to be

8    questions to demonstrate that this process was faulty, I start

9    to get, we don't know yet.  Then I get a new answer.

10    THE COURT:  There's really no excuse for not knowing

11    when you're coming into court in response to a direction to

12    bring your list and that list is the list.  I don't know in

13    advance what's on it, but you're supposed to have it all.

14    I don't even understand.  How would an email system

15    work here if what you want the plaintiff to deliver for you is

16    a piece of paper?

17    MR. LEHMAN:  The contract says that they'll do two

18    things.  The first is that they'll do a direct-mail campaign to

19    at least 730,000 vacationers.  The sponsor will also receive

20    300,000 followup weekly digital impressions through

21    September 30, 2016, for two products.  So there are two things.

22    One is the mailing, and one is the digital impressions which is

23    emails, the emails that you could sign up for right now.

24    But even if it was just the paper, even if it was just

25    the postcard that people somehow got and wrote down, some

1   amount of those people would put their email down.  In fact, I

2   believe that most people would rather put down their email than

3   their address, their actual physical address.  That's a little

4   bit speculative.

5         Nowhere on this actual list -- this is the same list

6   that we saw in terms of columns when we went to Mr. Knox's

7   office.  Where are those emails?

8         MR. KNOX:  Your Honor, not to evade the question at

9   all, but in order to, I guess, solve the problem that we have

10  here is to see if any of these individuals actually booked from

11  the client, we would need their addresses, which is everything

12  on this list, names and addresses.  We've proposed what's

13  called a match-back, in which case defendant during his

14  deposition an my client both agreed that this is the standard

15  in the industry.

16        They refused to give us the names of those who have

17  booked in order to permit us to perform a match-back.  I

18  believe that if we were able to do that, we would be able to

19  discern whether or not any of their bookings are attributable

20  directly to this list.

21        THE COURT:  Isn't their position that they got no hits

22  whatsoever?

23        MR. LEHMAN:  Yes, your Honor.

24        MR. KNOX:  If that's the case, then where is the harm?

25        THE COURT:  There is no harm unless they have to pay

1    you for something that they didn't get.

2              MR. KNOX:  I don't believe a cost was discussed among

3    the parties.

4              MR. LEHMAN:  I didn't hear the question, your Honor.

5              THE COURT:  Aren't you suing for unpaid bills?

6              MR. KNOX:  I'm sorry.  I'm referring directly to a

7    cost of performing the match-back.

8              THE COURT:  The point is Treasure Chest sent these

9    mailings on a certain day, supposedly did followup by email.

10   The followup is by email; right?

11             MR. KNOX:  It should have been a followup by email if

12   anything.

13             THE COURT:  Over how many weeks was Treasure Chest to

14   have been doing mailings on behalf of the defendant?

15             MR. KNOX:  I believe it's over the course of about

16   three or four months.

17             THE COURT:  Does that seem right to you?

18             MR. LEHMAN:  We'd have to talk to the client on "over

19   the course of three or four months."  Your Honor, one, I do

20   want to object to the characterizations of what was said that I

21   agreed to or didn't agree to.  I'd have to hear what he thinks

22   we agreed to.

23             The reason why the match-back is unneeded is because

24   the deal that our client put together had a special price and a

25   special code that you could only have received if you got one

1    of the inserts.  No one else had it, and they got zero from

2    that.  So there is no need for a match-back.

3            MR. KNOX:  If I may, your Honor.  The match-back would

4    only be to address whether or not they received anything.

5    Beyond that, there was no guarantee made that they would

6    absolutely make money from their campaign except a free

7    followup which is in the contract.  So if my client fell short

8    of performing his duties, then they would have gotten a

9    followup the following season advertising free.  It would have

10   been included.

11           Beyond that, it's advertising.  You can't guarantee

12   that someone through a campaign is going to make a certain

13   amount of money.  So in that respect, it seems rather

14   irrelevant that they didn't make any money on it.

15           THE COURT:  It's not that they didn't make any money.

16   I don't think the statement is we didn't make a profit.  I

17   think what the defendant is saying is we did not receive a

18   nibble in response.

19           And what they're saying is if you had a legitimate,

20   targeted list of people who were actually interested in travel

21   and you sent a mailing to something like 750,000 people, that

22   mathematically one would expect some level of response and that

23   when there is zero response, that that calls into question

24   whether, A, you ever mailed anything; B, whether you were using

25   a list that was a legitimate, targeted list of travelers.

1    That's the point.

2         No one is saying that the defendant had to make a

3    certain amount of money.  I think that's the problem here.

4         MR. KNOX:  My client's position would be that --

5         THE COURT:  Tough luck?

6         MR. KNOX:  Not necessarily.  It's more along the lines

7    of there are other clients that were satisfied and continue to

8    work with him over the years, and this one client, who it's my

9    client's position that that was not necessarily the highest

10   quality of product or they didn't have the brand recognition

11   necessary.

12        THE COURT:  How long has the defendant been in

13   business?

14        MR. LEHMAN:  You could Google it online.  I'm going to

15   guess 25 years, 30 years.

16        THE COURT:  In other words, this was not your first

17   rodeo?

18        MR. LEHMAN:  No, not at all.

19        MR. KNOX:  To be clear, it's the exact product that

20   they were advertising this time.  So it's a new company, a

21   European cruise company, and Auto Euro, which is a car company,

22   again, in Europe.

23        MR. LEHMAN:  Your Honor, there are a lot of responses

24   I have to a lot of what's been said.  The reason why I'm here

25   today was because of a discovery issue because this is similar,

 1    if not exactly the same, as what I saw when I went to

 2    Mr. Knox's office, and it instantly looks like this list is

 3    completely inappropriate.

 4            There are no emails.  These are cruises to Cuba.

 5    These are Silver Seas, which is a high-end cruise ship.  I

 6    don't know Stephanie.  I don't know how many cruises she's been

 7    on.  I don't know how many vacations she's taken last year.

 8            By the way, when you sign up online, they ask you

 9    similar questions on what used to be called Treasure Chest and

10    what's now called World's Greatest Vacation.  I don't have any

11    of the information that's on this list.

12            What I've been told is that they took that mailing,

13    they used this list, they sent it out, and we got zero

14    responses.  I also have a response for why someone like

15    Carnival would get a response on match-backs, because you just

16    mailed it to 700,000 people.  If you ask Carnival who booked on

17    your last trip, you're going to get some overlap with a million

18    people.  That doesn't mean the product works.  Again, the

19    reason why I'm here today is discovery.

20            THE COURT:  So I think what we've sort of in a sense

21    discovered is that we don't have or have not had produced to

22    you was an email list that was utilized in connection with your

23    contract, if there is such a thing that exists.  I don't know.

24            MR. LEHMAN:  The problem I'm facing is every time I

25    raise a problem with what I'm looking at, then the answer is

1    changing.  The conference today was to produce the list that

2    they relied upon.  Apparently he did, but there are no emails

3    on it.

4         So I don't want another production where now they say,

5    well, here are the emails, and they say, well, what about this

6    problem?  What about that problem?  I just want the list or

7    some subset of it, and that's what I'm looking at.  I'm looking

8    at exactly what they produced before in his office.

9         THE COURT:  At that time did you say, where are the

10   emails?

11        MR. LEHMAN:  No, because as a litigator, I'm going to

12   know how to play my cards.  I believe that the plaintiff is

13   lying.  I believe that he's committing fraud.  That's what I've

14   alleged.

15        When I'm dealing with someone who is lying or

16   committing fraud, I'm very careful about when I unveil my

17   questions because I think he's going to lie in the future to

18   cover it up.

19        MR. KNOX:  Your Honor, if I may.  I have to object to

20   my adversary's statement that answers have changed.  I don't

21   know what statements he's referring to.  And my client hasn't

22   been deposed yet.  So, again, it seems a little off that there

23   would be questions posed and answers changing when there hasn't

24   been a deposition.

25        MR. LEHMAN:  So I can give an example of one answer

 1    that changed.  I asked Mr. Shane, how do you know that these

 2    people can afford a cruise?  He paused.  He waited, and he

 3    said, well, I would use their ZIP codes.

 4         Okay.  So where is the information on the money that

 5    was for each ZIP code?

 6         MR. KNOX:  Where is the change?

 7         THE COURT:  The point is that if that's your answer,

 8    you ought to have a document that supports the notion that if

 9    you live in certain ZIP codes that you're wealthier.  That's

10    the point.

11         MR. LEHMAN:  The change would be that now I'm only

12    looking at a partial list because there must be some other

13    document out there that has ZIP code incomes.

14         THE COURT:  Would you do this to kind of bring this,

15    at least for today, to an end since there are other people in

16    the courtroom waiting.  Could you write a document demand now

17    based on what you know?

18         So your demand shouldn't be, give me all the

19    documents.  You can do that too but a document demand that is

20    very specific seeking the lists of email addresses that were

21    utilized, seeking the ZIP code information, things that you now

22    know.  And then we can direct that their responses be sworn to.

23         MR. LEHMAN:  Sure.

24         THE COURT:  And if we're going to deal with the same

25    issue of this is a trade secret, the responses can be sent to

1    me, and we can come back again.

2           MR. LEHMAN:  Yes, your Honor.

3           THE COURT:  How about that?

4           Do you have any other suggestions as to going forward?

5           MR. LEHMAN:  I generally wish that the plaintiff would

6    just send you the list that he used for this mailing, the whole

7    list, to just you.  It's frustrating.  If Samsung and Google

8    can have massive lawsuits where they have tons of proprietary

9    information trading back and forth, certainly we can.  As a

10   lawyer if I say I'm not going to turn this over even to my

11   client, surely --

12          THE COURT:  We can do attorneys' eyes only protective

13   order.  That works for me.

14          MR. LEHMAN:  That works for me.

15          MR. KNOX:  I would accept that, your Honor.  I would

16   agree.

17          THE COURT:  So you need to then turn over to

18   Mr. Lehman everything your client claims to have relied on in

19   this mailing.  As I say, we can reconvene if we have more

20   problems.

21          MR. LEHMAN:  Your Honor, there were two other issues.

22          THE COURT:  Sure.

23          MR. LEHMAN:  The first is that plaintiff has only

24   produced one or two emails that plaintiff sent to us.  We

25   produced the emails sent to them.  We also haven't seen any of

1   the emails, for example, that they sent to the people who

2   printed these things saying, here is this semester's mailing.

3        In addition, their objections don't comply with

4   amended Rule 34.  When they say something like it would be too

5   burdensome to produce that, then they're required to describe

6   what subset of documents they're withholding and why it would

7   be too burdensome, and we don't have that.

8        THE COURT:  I would be really pretty surprised if

9   there was anything that qualified here.  I can understand that

10  none of us want pages of documents with 750,000 or a million

11  names on them, but for our purposes, it really doesn't matter.

12  A random selection -- which, by the way, we have absolutely no

13  way of knowing if this is random at all.  We just don't.  I

14  don't know if it's in compliance with what I asked for or it's

15  not because there are no page numbers.

16        MR. LEHMAN:  Well, your Honor, for example, on my

17  document request number 5, the plaintiff makes very specific

18  representations such as plaintiff has "an 8 percent response

19  rate."  That's 5(e) on page 4 I believe.

20        Is there a document that supports that they have an

21  8 percent response rate?

22        THE COURT:  What I'm suggesting to you that you can

23  now, because you know more, instead of serving a document

24  request which says give me everything, you can make a more

25  specifically targeted request and see what, if anything, is

 1   produced in response.

 2          From your point of view, zero is the best response.

 3   No response is the best response.  No production.

 4          MR. LEHMAN:  I agree with that except that one of the

 5   reasons why they amended Rule 34 is to say --

 6          THE COURT:  I'm not talking about burdensome.  I'm

 7   talking about there are no documents in response to this

 8   request.

 9          MR. LEHMAN:  But I don't know that that's true because

10   that statement has not been made.

11          THE COURT:  But my point is if you target your

12   document requests carefully, then you increase the chances of

13   the response having to be there are no documents in response to

14   your request.  It's the good way to write a complaint to compel

15   the answer to actually tell you something.  So that's what I

16   suggest you do next.  Then you can contact me for help.  Okay?

17          MR. LEHMAN:  Okay.

18          THE COURT:  Fair enough.  Anything else?

19          MR. LEHMAN:  No.

20          MR. KNOX:  Just so I understand, your Honor will be

21   issuing a protective order?

22          THE COURT:  No.  You guys have to write it.  I'll sign

23   it, unless you start paying me $100 an hour.  I don't write

24   things, except opinions.

25          MR. KNOX:  Understood.  Thank you, your Honor.

1          THE COURT:  Let me return all of these to you.  Also

2    the advertising package.

3          (Adjourned)