I65KTRET

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

TREASURE CHEST THEMED VALUE
MAIL, INC.,

                Plaintiff,

          v.                          17 CV 00001 (NRB)

DAVID MORRIS INTERNATIONAL,
INC.,

                Defendant.

------------------------------x
                                      New York, N.Y.
                                      June 5, 2018
                                      9:41 a.m.

Before:

               HON. NAOMI REICE BUCHWALD,

                                      District Judge

                    APPEARANCES

DANIEL KNOX
     Attorney for Plaintiff
     -and-
ALEXANDER KADOCHNIKOV

LEHMAN LAW GROUP LLC
     Attorneys for Defendant
BY:  BRIAN E. LEHMAN
     JULIE R. SOLARZ

I65KTRET

1

2          (Case called)

3          THE LAW CLERK:  Is the plaintiff present and ready to

4     proceed?

5          MR. KNOX:  Yes.

6          THE COURT:  Just state your name for the record.

7          MR. KNOX:  Daniel Knox, Knox Law Group.

8          THE LAW CLERK:  Is the defendant present and ready to

9     proceed?

10          MR. LEHMAN:  Yes, your Honor.

11          Brian Lehman, from Lehman LG LLC, and the principal

12     for David Morris International is in the front row.

13          THE COURT:  Okay.  And I think Ms. Solarz is present?

14          MS. SOLARZ:  Julie Solarz, attorney for the defendant.

15          THE COURT:  All right.

16          I thought it would make sense to begin by addressing

17     the recent letter exchange, starting with the defendant's

18     June 1st letter, responded to by the plaintiff on June 2nd, and

19     the reply from the defendant on June 3rd, in which the

20     defendant is moving for judgment under Rule 52(c) and also

21     moving to preclude four exhibits that were appended to the

22     affidavit of the plaintiff's principal, Mr. Shane.

23          So, I'm prepared to rule on all those motions, but

24     before I do, Mr. Lehman, if there's something that you wish to

25     say that you haven't said in your papers, please do.

I65KTRET

1          MR. LEHMAN:  Thank you, your Honor.

2          Just two quick things that are not in the letter:  We

3    would move to preclude the exhibits as hearsay, those four.

4    They're out-of-court statements that I believe are being

5    presented for the truth therein.  I don't know of any other

6    reason why they're being presented.

7          And, particularly, there's one email that involves

8    match-back email that was sent by someone who isn't in this

9    courtroom, as far as I know.  And the second is we would move

10   to preclude at least what they call the postal receipt under

11   the best evidence rule, which I think is Federal Rule of

12   Evidence 1002.  They're required to give the original.  So, in

13   addition to the reasons stated in the letter, those would be

14   the two other reasons we would move to preclude.

15         Thank you, your Honor.

16         MR. KNOX:  Your Honor, just in response to those

17   objections:  The evidence -- they're excepted from the hearsay

18   rule as business records, commonly kept in the business of my

19   client, including the postal receipt, the match-back report,

20   and even the email between the counsel -- I'm sorry, between

21   the parties regarding the number of leads that were provided.

22         THE COURT:  All right.

23         I think that it is relevant to recall a little history

24   of this case before specifically addressing the motions.

25         We had a conference on April 17th -- it was a fairly

I65KTRET

1    lengthy conference, 22 pages of transcript -- and at the end of

2    that conference, I advised the defendant, who was expressing

3    some dissatisfaction with the discovery situation, to propose

4    targeted document requests.  Well, the very next day, the

5    defendant --

6              Who I understand has never deposed Mr. Shane?

7              MR. KNOX:  Correct, your Honor.

8              THE COURT:  -- chose not to file those document

9    requests, but instead sent me a letter and said he was ready

10   for trial, foreswearing any additional discovery.

11             So, let's turn to the specifics of the motion to

12   preclude.

13             The postal service receipt, which is Exhibit D, first,

14   is a business record of the plaintiff.  But, moreover, the fact

15   that the plaintiff did this mailing isn't even in controversy,

16   so fighting about the exhibit seems quite pointless.

17             Exhibit E are these electronic newsletters and social

18   media emails that the plaintiff posts.  The claim is that these

19   documents are of some surprise to the defendant.  I find that

20   hard to believe.  If I were engaged in a business transaction

21   in which I was contracting for such exposure, I think as a good

22   businessperson, I would have checked it at the time, so I don't

23   think there's any surprise.  And remember that the defendant

24   did have a chance to seek additional discovery and forewent

25   doing so.

1          Exhibit F are the leads, presumably, sent to the

2     defendant at the time.  So, that motion is denied.

3          The Exhibit G at the April 17 conference, when this

4     issue of match back with respect to another company was raised,

5     I ruled against the introduction of that.  Frankly, had I

6     understood better at the time that the proffer of that evidence

7     was really more in the nature of rebuttal evidence, and had I

8     appreciated that the defendant had decided not to depose

9     Mr. Shane, facts which I think are actually fairly critical, I

10    would not have ruled the way I did, but I did.  However, there

11    is no reason that Mr. Shane cannot testify about whether other

12    companies who were included in the same mailing either

13    expressed dissatisfaction or were satisfied.  So, I don't think

14    Exhibit G is very significant in this context.

15         Let's turn to Rule 52, the motion.

16         I think I ought to start by saying that -- well,

17    actually, let me go back.  Mr. Lehman, you argued -- well, you

18    asserted, I think, somewhat rather than argued.  In your

19    proposed findings of fact and conclusions of law, you put in

20    some law about ambiguous contracts, and I honestly have no idea

21    what you find ambiguous about the contract.  I do not find

22    anything about the contract ambiguous.  If you're pursuing

23    that, could you explain it to me?

24         MR. LEHMAN:  Yes, your Honor.  I think there would be

25    two ambiguities, the most important of which is the phrase

I65KTRET

1   "digital impressions."  At the last hearing that you referred

2   to on April 27th, everyone in the courtroom, including

3   Mr. Knox, considered that to mean emails.  So, from page 13 of

4   that transcript, your Honor said:  The point is Treasure Chest

5   sent these mailings on a certain date, supposedly did follow-up

6   by email, the follow-up is by email, right?

7           And then Mr. Knox responded:  It should have been a

8   follow-up by email, if anything.

9           And that was our understanding throughout the 18

10  months of this litigation.  The exhibits that Mr. Knox has

11  presented involve social media, Twitter, Instagram, Facebook

12  page as satisfying the phrase "digital impressions."  If that's

13  true, then I would argue that they're either so ambiguous, that

14  the contract should be void, or that it should be interpreted

15  in our favor as to only meaning emails.

16          MR. KNOX:  Your Honor, to clarify, emails were sent,

17  but there was also a posting on the social media pages as well.

18  The impressions themselves, the advertisement, was presumably

19  created by the defendant and provided to the plaintiff for such

20  a purpose, specifically to post on its social media pages.  So,

21  for them to argue it now, I find absolutely disingenuous.

22          MR. LEHMAN:  Your Honor, I don't know that there's any

23  evidence that we presumably did anything to put it on social

24  media.  And I think that will be a question to --

25          THE COURT:  I don't think you were putting it on

I65KTRET

1   social media, but I think the plaintiff had a variety of social

2   media accounts, and they, as I understand it, posted

3   information about the defendant companies on those accounts,

4   along with other of the companies that they were advertising in

5   that mailing.  I think -- I don't really buy your argument, so

6   I don't think "digital impressions" translates to email.  Email

7   is email.

8        But, also, if you look at what is page 3 of 14 of the

9   exhibits, if you look at the very top, it says, "View This

10  Email In Your Browser."  So, I don't find that to be ambiguous.

11       Go ahead.

12  MR. LEHMAN:  And the second one was, your Honor, the

13  requirement that my client give up to -- I'm trying to find

14  it -- it's in section 3 of the contract -- up to 40,000 in

15  airfare and hotel accommodations.  There is case law that -- in

16  New York that states that when you say a phrase such as up to

17  40,000, the contract is void because the Court can't

18  definitively determine where between zero and 40,000 to award

19  or in which time period.

20       THE COURT:  Okay.  But that has nothing to do with

21  whether the plaintiff breached the contract or not.

22       MR. LEHMAN:  That's correct, your Honor.  It would

23  have --

24       THE COURT:  So why don't you get to -- I think that's

25  the first step.  I think, as I understand it, it means that the

I65KTRET

1   plaintiff can demand of you up to 40,000 in airfare and hotel

2   accommodations.  It simply doesn't require them to.  You could

3   come out ahead.

4           So, I reject -- and as everyone recognizes, it is the

5   role of the Court to determine whether a contract is ambiguous

6   or not.  I reject the argument that this contract is ambiguous.

7           And, again, in your proposed findings and conclusions,

8   you stated that, at paragraph 27, "Defendant hereby withdraws

9   its fraud and breach-of-contract claims," and in 29, you said

10  that, "Because the Court has not yet determined whether the

11  contract at issue is valid, plaintiff does not withdraw its

12  counterclaim of unjust enrichment."  However, I have now found

13  the contract to be valid, so I assume that you've also

14  withdrawn your claim of unjust enrichment.

15          MR. LEHMAN:  No, your Honor.  But I would recognize,

16  now that you've ruled, that the contract isn't ambiguous, that

17  that eliminates the unjust enrichment clause under New York

18  law, and we will just preserve the issue for appeal.

19          THE COURT:  All right.  So you're no longer claiming

20  that the plaintiff breached the contract, you're no longer

21  claiming the plaintiff committed fraud, and you recognize that

22  you don't have a claim for unjust enrichment given my ruling on

23  the validity of the contract.

24          I really don't think I understand what your argument

25  is -- your argument that the affidavit submitted by Mr. Shane

I65KTRET

1  is insufficient to set out a prima facie case.

2          MR. LEHMAN:  Given your Honor's rulings, I could argue

3  it, but I think that, at this point, I would just preserve the

4  Rule 52 issue for appeal and --

5          THE COURT:  All right.  Okay, fine.

6          You have no witnesses, correct?

7          MR. LEHMAN:  I have witnesses for impeachment

8  purposes, your Honor.  Just one.

9          THE COURT:  All right.  Well, let's discuss this a

10  little bit more.

11          Why don't we just call Mr. Shane, swear him in, and

12  then let you -- do you want to cross-examine him?

13          MR. LEHMAN:  Yes, your Honor.

14          THE COURT:  Okay.

15          Be careful.  There are always wires on these floors.

16  RICHARD FRANKLIN SHANE,

17      called as a witness by the Defendant,

18      having been duly sworn, testified as follows:

19          THE LAW CLERK:  Would you please state your full name

20  and spell your last name for the record.

21          THE WITNESS:  Richard Franklin Shane, S-h-a-n-e.

22          THE COURT:  Please be seated.

23          THE WITNESS:  Thank you.

24          THE COURT:  I think the typical first question at this

25  point is normally Mr. Knox's, but I'll do it for you:

1              Mr. Shane, is the document I'm showing you, which

2     bears what we call the ECF designation document 39, a copy of

3     the affidavit that you submitted in this case?

4              THE WITNESS:  Yes, your Honor, it is.

5              THE COURT:  And as you sit here today, do you still

6     swear that the entirety of this affidavit is true and correct?

7              THE WITNESS:  Yes, your Honor, I do.

8              MR. LEHMAN:  Thank you, your Honor.

9     CROSS-EXAMINATION

10    BY MR. LEHMAN:

11    Q.  Mr. Shane, do you have any reason to think that your memory

12    would be impaired today?

13    A.  No.  Can you speak up, Brian?  I'm hard of hearing.

14    Q.  I'd appreciate you calling me Mr. Lehman since I'm calling

15    you Mr. Shane.

16             THE COURT:  Just one second.  We can up the mics.

17    Q.  Mr. Shane, can you tell me about your business, please?

18             MR. KNOX:  Objection.

19             THE WITNESS:  About my business?

20             THE COURT:  That's not --

21    BY MR. LEHMAN:

22    Q.  Mr. Shane, do you have offices in New York?

23    A.  Yes.

24    Q.  Where are your offices located?

25    A.  104 West 40th Street, New York, fifth floor.

I65KTRET                         Shane - Cross

1  Q.  Do you have any other offices?

2  A.  I have offices -- sometimes when I travel, I keep an office

3  in Colorado, when I travel, I'll keep an office in Los Angeles,

4  and we have an office or someone that works for me in Europe.

5  Q.  You just said "We."  Do you have other employees or people

6  you work with?

7  A.  I have independent contractors.

8  Q.  Who do you work with?

9            THE COURT:  Excuse me.  I don't understand the

10  relevance of any of these questions.

11            MR. LEHMAN:  It's going to go to how this process

12  worked.  We do not believe that he actually even mailed these.

13  And there should be other people who participated in a

14  1.4 million mailing.

15            THE WITNESS:  May I address that, your Honor?  This is

16  my first time in the court, so bear with me.

17            THE COURT:  All right.  Well, if you want to ask him a

18  targeted question as to who else participated in creating

19  these --

20  BY MR. LEHMAN:

21  Q.  Who is your chief digital marketing director?

22  A.  Excuse me?

23  Q.  Who is your chief digital marketing director?

24            MR. KNOX:  Objection.

25            THE COURT:  This assumes a fact not in evidence.

I65KTRET                                    Shane - Cross

1   BY MR. LEHMAN:

2   Q.   Do you have a digital marketing person?

3   A.   Yes.

4   Q.   Who is he?

5   A.   Michael Marack.

6   Q.   Do you have any other offices in New York or places you'd

7   go that you went for this particular mailing, or was it just

8   104 40th Street?

9              MR. KNOX:  Objection.

10             THE COURT:  Sustained.

11  Q.   Do you know what this is?

12             MR. KNOX:  Objection.

13             MR. LEHMAN:  Do you have a grounds for the objection?

14             THE COURT:  Well, you might want to show it to him.

15  And why don't you mark it.  It's a court of law.

16  BY MR. LEHMAN:

17  Q.   Do you know what I'm holding?

18  A.   Yes.  It's a copy of one of my mailings, which, by the way,

19  was mailed to -- post office receipts, USPS, it's called a 3602

20  post office receipt, which documents that it was mailed.

21  Q.   Do you know how I got this?

22             THE COURT:  Excuse me?

23             THE WITNESS:  It may have been handed to you because

24  they're sent samples.  It's not sent to you through the mail

25  because there's no address on that, printed on there.

I65KTRET                          Shane - Cross

1              MR. KNOX:  Your Honor, I'd, again, like to object.

2     Opposing counsel hasn't actually handed the document.  We don't

3     know -- it should be described by the witness --

4              THE COURT:  This is Defendant Exhibit 1.  Is it

5     marked?

6              MR. LEHMAN:  Yes, your Honor.

7              THE WITNESS:  This looks like a copy of --

8              THE COURT:  Mr. Shane, open it up, take your time,

9     and --

10             THE WITNESS:  Thank you.

11             THE COURT:  Let me advise you now:  Only answer

12    exactly what he asks you.  Do not go off --

13             THE WITNESS:  Thank you.

14             THE COURT:  -- rambling.

15             THE WITNESS:  This is my first time.  Thank you.

16             This is a copy of the mailing that was sent out.

17    BY MR. LEHMAN:

18    Q.  Is this the copy of the mailing that was sent out for David

19    Morris International?

20    A.  It looks like it.  I can't promise you, I send out a lot,

21    but it looks like it.

22    Q.  Do you use a company to send those out?

23    A.  Yes.

24    Q.  Which company do you use to send those out?

25    A.  It's a division of R.R. Donnelley Printing.

I65KTRET                              Shane - Cross

1   Q.   What is the name of that company?

2   A.   It's a division of R.R. Donnelley Printing.  This would

3   have been Northwest Mailing Services, I believe.

4   Q.   Do you know where they're sent out from?

5   A.   They are printed, I believe, in Chicago -- this is six --

6   this is several years ago.  I believe they're printed in

7   Chicago, and then they are distributed to bulk mail centers

8   around the country.

9            THE COURT:  You withdrew your claim for fraud.

10           MR. LEHMAN:  I'm not arguing --

11           THE COURT:  Just a second.  If your argument that you

12   made a moment ago, that he didn't actually mail these, that's a

13   fraud claim, and you have withdrawn that.

14           MR. LEHMAN:  Your Honor, it would be a fraud claim if

15   at the time he made the contract, he had the intent not to mail

16   it.  However, if he made the contract with the intent to mail

17   it, and then later on decided not to do it or just didn't do it

18   inadvertently, negligently, it would just be a breach of

19   contract.

20           THE COURT:  You withdrew that claim, too.

21           MR. LEHMAN:  The element that he has to show is

22   performance of the contract.  By not mailing it, he would not

23   be showing performance of the contract on his part.

24           THE COURT:  Yes, you're right, but you withdrew your

25   counterclaim for breach of contract.

1           MR. LEHMAN:  That's right, we are not seeking any

2    damages for breach of contract on our side.  What we are saying

3    is that he did not adequately perform the contract.

4    BY MR. LEHMAN:

5    Q.  Do you have any offices in Florida?

6           MR. KNOX:  Objection; asked and answered.

7           THE COURT:  As far as I can tell, it's irrelevant.

8    Q.  Do you have any people that work for you in Florida?

9           MR. KNOX:  Objection.

10          MR. LEHMAN:  What's the grounds?

11          THE COURT:  Tell me what the relevance is.  Some

12   requirement that he perform this contract in Florida?

13          MR. LEHMAN:  Your Honor, I would just ask, just this

14   one time, he answer the question, so that -- because what I

15   believe is going to happen is if I start telling you the

16   relevance of this, he will change his answer depending on what

17   I reveal.

18          THE WITNESS:  What was the question, please?

19          THE COURT:  Do you have an office in Florida?

20          THE WITNESS:  I don't have an office in Florida full

21   time, but sometimes, yes.

22          MR. LEHMAN:  Your Honor, do you want me to mark --

23          THE COURT:  I wanted you to treat this like you would

24   any trial, in which case, yes, you mark exhibits to create a

25   record and clarity on the transcript.

I65KTRET                    Shane - Cross

1            MR. LEHMAN:  It's already Exhibit B of the plaintiff's

2      affidavit.  That's why I was asking.

3            THE COURT:  Unless you're adopting it as your own, you

4      don't have to.

5            MR. KNOX:  I'm sorry, may I have a copy?

6            MR. LEHMAN:  You didn't bring a copy of the

7      plaintiff's --

8            MR. KNOX:  I have my copy, but I don't know exactly

9      what you're showing the witness.

10           MR. LEHMAN:  It's Exhibit B of --

11           THE COURT:  Just show opposing counsel before -- any

12     exhibit before you show it to the witness.

13           MR. KNOX:  I would object.  This is not an accurate

14     representation of Exhibit B.

15           MR. LEHMAN:  Do you have Exhibit B of your own

16     affidavit?

17           MR. KNOX:  I do.

18           MR. LEHMAN:  May I see it?

19           May I see Exhibit C?

20           MR. KNOX:  Exhibit C is a two-page document.

21           MR. LEHMAN:  I'm showing the second page of Exhibit C

22     from plaintiff's affidavit, which was represented to be --

23           MR. KNOX:  Your Honor, if I may, I would like to

24     object.  I'll give opposing counsel permission to use my copy,

25     but I ask the entire exhibit be presented to the witness at

I65KTRET                          Shane - Cross

1   this time.

2              THE COURT:  There's no reason not to show him the

3   whole thing.

4              MR. KNOX:  And to state again, opposing counsel can

5   use my copy.

6   BY MR. LEHMAN:

7   Q.  Do you know what this is?

8   A.  Yes.

9   Q.  What is it?

10  A.  It's a business reply card.

11  Q.  Was it the business reply card used for David Morris

12  International's mailing?

13  A.  It could be.  It looks like it.

14  Q.  Did you say in your affidavit --

15             THE COURT:  Excuse me one second.  Do you have any

16  real originals?

17             MR. KNOX:  Of this --

18             THE COURT:  You know, old traditional colored hard

19  copy.

20             MR. KNOX:  I do, your Honor.  I brought these because

21  I wasn't able to scan them and upload them to the ECF, so I

22  thought it would be more prudent to bring exactly what was

23  scanned.  So I don't have the actual laminated insert.

24             THE WITNESS:  This is a copy of it, your Honor, if

25  that helps.

I65KTRET                          Shane – Cross

1              THE COURT:  Okay.

2              MR. KNOX:  May I see it?

3              THE WITNESS:  This is what counsel has brought in the

4    envelope.  It's in the envelope.  And that does look like an

5    accurate representation.

6    BY MR. LEHMAN:

7    Q.  Just to read what he put in his affidavit, "Treasure Chest

8    created a response card bearing the logos of both companies on

9    defendant's insert for inclusion in the spring 2016 mailing

10   campaign.  A true copy of the response card utilized in the

11   2016 mailing campaign is annexed hereto as Exhibit C."

12             Is there a city in Florida called South Florida?

13   A.  Apparently.

14   Q.  Were all the cards sent to that address?

15   A.  Yes.

16   Q.  Have you been to a city called South Florida?

17   A.  I don't know that I have.

18   Q.  Do you know what zip code that represents?

19   A.  I am assuming South Florida.

20   Q.  Who picks up these cards?

21   A.  A data processing company that I've contracted.

22   Q.  And then they're mailed to you or something else happens

23   with them?

24   A.  Data processing data entry.

25   Q.  What's the name of that company?

1    A.  Direct Services.

2    Q.  Would you be surprised if I told you there is no city

3    called South Florida?

4    A.  No.

5    Q.  Are you surprised that there's no address on that?

6    A.  Not at all.

7    Q.  Why not?

8    A.  Because it has a PO box.

9    Q.  So you think that that one PO box would be unique within

10   that area code?

11   A.  It's not something I've ever given any thought to.  I've

12   never had reason to question this.

13   Q.  Do you know what happens with these cards after they're

14   sent to the data processing center?

15   A.  Yes.

16   Q.  Could you please tell me what happens to it?

17   A.  They are input -- data processing company picks them up at

18   the PO box, they are input, and retained for a fee.  I forget

19   what's required, but whatever it is, it's retained.

20   Q.  Do you have any evidence with you that shows that you sent

21   out weekly digital impressions?

22           MR. KNOX:  Objection.

23           THE COURT:  You can answer that.

24           THE WITNESS:  A digital impression?

25   Q.  Do you have any evidence with you that you sent out

I65KTRET                           Shane - Cross

1   digital -- or weekly, weekly, digital impressions?

2   A.  Not on me.

3   Q.  Did David Morris ever tell you that he used a unique phone

4   number and a unique code to track any sales that would come

5   through this mailing?

6           MR. KNOX:  Objection; hearsay.

7   Q.  Did David Morris ever tell you --

8           THE COURT:  It doesn't have to be true.

9           THE WITNESS:  Did he ever tell me?  Not that I recall.

10  Not that I recall.

11  BY MR. LEHMAN:

12  Q.  Sitting here now, do you know if David Morris International

13  used a unique phone number and unique code to track any sales

14  from this mailing?

15  A.  I wouldn't give that any thought because it's not an

16  accurate way of tracking, so I don't know that he ever did.  I

17  wouldn't -- I don't know.

18  Q.  Why do you think it's not an accurate way of tracking?

19  A.  It's -- advertising 101 expanded answer:  Because when

20  somebody gets something in the mail now, he or she can book via

21  going online, calling their travel agent, if they go online,

22  the phone number on the website -- and call the phone number on

23  the website is frequently given than the one that goes in the

24  mailing, so it's not -- no companies use that as a tracking

25  mechanism anymore.  That was done way -- when Google came out.

I65KTRET                          Shane - Cross

1          So, that's the purpose of the match-back, which was

2     not done, and that's how you accurately track bookings.  It's

3     the industry norm.

4          THE COURT:  Would you explain to me what match back

5     is?

6          THE WITNESS:  Sure.  So, match back is the industry

7     way of tracking bookings.  You take the address of the

8     booking -- bookings that come in and match them against the

9     addresses of the media's database from a designated time

10    period, and you take address to address, match back to see what

11    the matches are.

12         That's now done throughout the industry, bookings

13    match-back, which was not done in this case, so there's no way

14    for them to know if they got the bookings or not that they're

15    claiming they didn't get.

16         THE COURT:  So the match-back would then pick up --

17         THE WITNESS:  Bookings.

18         THE COURT:  -- pick up a booking regardless of how the

19    customer made --

20         THE WITNESS:  Correct.

21         THE COURT:  -- the booking?

22         THE WITNESS:  So the customer could have booked

23    through his or her travel agent, they could have gone online

24    and booked, they could have called the company directly and

25    booked.  So, the way that you get to the bottom line of it is

I65KTRET                         Shane - Cross

1   look at the addresses of who received the media from the time

2   the media hit through typically it's 16 weeks and match back.

3   It's the most accurate way of tracking, but it's somewhat

4   imperfect because the media may get credit for a booking even

5   though the person didn't respond to the literature, they just

6   happened to be on the database.  The media won't get credit if

7   someone receives the mailing at their home, and they booked in

8   their office, or someone says to their friend, you'll like this

9   trip, you should book.

10         So, it's imperfect, but companies feel it balances

11  out, and it's the most accurate way of doing it, and until you

12  do that, you don't know if you have bookings.

13         THE COURT:  I'm curious.  How exactly do you do a

14  match-back, because you have --

15         THE WITNESS:  There's good faith involved, your Honor.

16  So, it's done half and half.  We give our database to the

17  client, and they -- we give them our full amount of database.

18  They then take it, and they do the match-back.  They take the

19  bookings that have come in and match them against the database.

20  It's good faith.

21         THE COURT:  So your database is on a computer, or you

22  give it to them on a flash drive or something?

23         THE WITNESS:  Right.

24         THE COURT:  And they similarly have recorded their

25  bookings in a computer-readable form?

1              THE WITNESS:  Uh-huh.

2              THE COURT:  And you throw them into a program --

3              THE WITNESS:  Exactly right.

4              THE COURT:  -- which does the match?

5              THE WITNESS:  And some will even do it manually, which

6     is crazy, right?  They'll do it by hand or like that.  So,

7     address to address, and that's how they track it.

8              THE COURT:  Does the company pay you something

9     additional to do a match-back?

10             THE WITNESS:  We offer it as a free service.  Or, if

11    you wanted us to do it, give us your bookings, and we'll do it.

12    And we sign an NDA saying we won't use the names for anything

13    else.

14             So, we can do it, and I have a vendor that does it, or

15    we identify a third party, if they want to do it, or I give

16    them my database, and they perform it, and whatever they say,

17    the results are added up.

18             THE COURT:  I think it's a given that in this case,

19    there was no match-back done, but actually there's no reason

20    that it couldn't have been done if the defendant asked you for

21    it?

22             THE WITNESS:  That's exactly right.  That's exactly

23    right.  And that's part of why I'm here, is to make the claim

24    that we didn't get any bookings, you don't know that when you

25    didn't do the match-back, so...

I65KTRET                          Shane - Cross

1             THE COURT:  Okay.  Thank you.

2             THE WITNESS:  Thank you.

3    BY MR. LEHMAN:

4    Q.  Did you use MailChimp to send out the email blasts?

5    A.  We've used MailChimp and another company called Constant

6    Contact.  I don't know, at that time period, which one we used.

7    Q.  Do you have any records that you send out a weekly either

8    email blast, or on a weekly basis, did any digital impressions?

9    On a weekly basis?

10            MR. KNOX:  Objection; compound.

11            THE COURT:  You can try to answer.

12            THE WITNESS:  Evidence that we do?  We can go back

13   and -- yeah, if it's available.

14            And to the point of the digital impressions and

15   emails, in advertising --

16   BY MR. LEHMAN:

17   Q.  Please, I asked the question.

18   A.  Okay.

19            THE COURT:  The answer is, yes, had you asked for it

20   during discovery, you could have gotten it?

21            THE WITNESS:  Correct.  Thank you, your Honor.

22   Q.  Do you remember the database that you showed me on

23   January 26th?

24            MR. KNOX:  Objection; it assumes facts.

25   Q.  Did you show me a database on January 26th?

1    A.  I showed you a database.  I don't know the date.

2    Q.  Do you remember that database?

3          THE COURT:  In what sense?  Could he recite it to you

4    now?

5    BY MR. LEHMAN:

6    Q.  Could you recite the columns on that database?

7    A.  Can I recite the columns?  No, I can't recite the columns.

8          THE COURT:  What were you just trying to ask, what

9    information --

10   Q.  What information was in that database?

11   A.  The name and postal address of our recipients.

12   Q.  Was there any information on how much money those people

13   had a household income of?

14   A.  No.

15   Q.  Was there any information on how many times they had been

16   on a cruise?

17   A.  In what I showed you?  No.

18   Q.  Was there any information on the last time they traveled?

19         THE COURT:  You can stipulate that the only

20   information, since it was the same thing I'm shown, is the name

21   and an address.

22         THE WITNESS:  Thank you, your Honor.

23         We --

24         THE COURT:  Stop.

25         THE WITNESS:  I'm sorry.

I65KTRET                          Shane - Cross

1   Q.  Where did you get that information in the database from?

2   A.  I don't understand the question.

3   Q.  Where did you get the information in the database from?

4         THE COURT:  How did you compile your database?

5         THE WITNESS:  Thank you, your Honor.

6         The database is made up of -- we've developed the

7   database, I guess, is the question.  People who have responded

8   to previous mailings like this, and on our website, and from

9   some travel databases that we rent.

10        THE COURT:  So, the bottom line is that everybody in

11  your database has, at some prior time, expressed some interest

12  in travel?

13        THE WITNESS:  That's exactly right, your Honor.  Thank

14  you.

15  BY MR. LEHMAN:

16  Q.  Do you remember giving leads to David Morris International?

17  A.  Yes.

18  Q.  Did you ever give a lead with an email to David Morris

19  International?

20  A.  Yes.

21        MR. LEHMAN:  Your Honor, I don't have any more

22  questions.

23        THE COURT:  Mr. Knox, you get a chance, if you want.

24        MR. KNOX:  My colleague, Alexander Kadochnikov, will

25  do a redirect.

 1            THE COURT:  Okay.

 2            MR. KADOCHNIKOV:  Good morning, your Honor.  Alexander

 3    Kadochnikov, of counsel to Knox Law Group, on behalf of the

 4    plaintiff.  I apologize.

 5            THE COURT:  Good morning.

 6    REDIRECT EXAMINATION

 7    BY MR. KADOCHNIKOV:

 8    Q.  Mr. Shane, would you clarify for the Court what the digital

 9    impressions are?

10    A.  Definition of a digital impression is any eyeball seeing

11    your message online.  So that would include -- in addition to

12    email, social media, website impressions, it's any viewing of a

13    message in a digital format, online.

14    Q.  So, does a digital impression include email in its

15    definition?

16    A.  Yes.

17            MR. KNOX:  No further questions.

18            Your Honor, at this time, I would like to move for a

19    directed --

20            THE COURT:  Just one second.  I might have a question

21    or two.

22            MR. KNOX:  Understood.  And I apologize.

23            (Pause)

24            THE COURT:  Just so I learn more about your

25    business --

T65KTRET

1          THE WITNESS:  Yes, ma'am.

2          THE COURT:  -- when a recipient of your mailing

3    returns the reply card, and they have circled one or more of

4    the companies -- let's take another one, but we'll take the

5    Breakers.  So somebody expresses an interest in the Breakers,

6    how does the Breakers then learn that somebody has circled the

7    Breakers?

8          THE WITNESS:  Each week following the mailing, for

9    about eight to ten weeks approximately, we send an email, an

10   Excel spreadsheet, to each advertiser with the name and contact

11   information of that consumer who requested information on their

12   product.

13         THE COURT:  Is this the first time that the Breakers

14   used your service?

15         THE WITNESS:  No.  They have used --

16         THE COURT:  How long have the Breakers been a client

17   of yours?

18         THE WITNESS:  They have repeated about a dozen times.

19         THE COURT:  Typically, let's say for the Breakers, is

20   that once a year, twice a year?

21         THE WITNESS:  We mail now, your Honor, twice a year,

22   each spring and fall.  Originally it was once a year, and it's

23   gone to twice a year.  They will repeat, based on their needs,

24   sometimes twice a year and sometimes once a year.  Again, at

25   least a dozen times.

T65KTRET

1          THE COURT:  And Cunard Lines?

2          THE WITNESS:  They repeat every year.  They've

3    repeated probably 15 times, and they frequently actually take

4    two inserts per season.

5          And if I may expand upon that, they have brought in

6    their sister cruise lines based on the success.  They are part

7    of Carnival Corp., and they have brought in their other cruise

8    lines.

9          And they did the match backing.  That's why they keep

10   coming back.

11          THE COURT:  Just to be clear, did some people who

12   received this mailing return the card expressing an interest in

13   the, I think, two companies that it was advertising?

14          THE WITNESS:  Yes, they did.

15          THE COURT:  Do you know offhand how many -- that's the

16   6,000?

17          THE WITNESS:  Yes, that's exactly right, your Honor.

18          THE COURT:  Okay.  All right.

19   Thank you.

20          THE WITNESS:  Thank you.

21          THE COURT:  Mr. Knox?

22          MR. KNOX:  Never mind at this time, your Honor.

23          THE COURT:  Nothing?

24          MR. KNOX:  Yes.

25          MR. LEHMAN:  Your Honor, I have one question only to

I65KTRET                        Morris - direct

1   ask Mr. Morris, to impeach his credibility.

2           THE COURT:  Okay.  I thought that's what you were

3   trying to do the whole time, but go ahead.

4           MR. LEHMAN:  Mr. Morris.  That's Mr. Shane.

5           THE COURT:  Oh, you want to call Mr. Morris to impeach

6   Mr. Shane?  I got it.  I'm sorry, I apologize.  Okay.

7           THE WITNESS:  Thank you, your Honor.

8           (Witness excused)

9           MR. KNOX:  Your Honor, if I may, at this time,

10  plaintiff would like to move for a directed verdict on the

11  breach of contract.

12          THE COURT:  I'll reserve.

13   DAVID ROBERT MORRIS,

14       called as a witness by the Defendant,

15       having been duly sworn, testified as follows:

16          THE LAW CLERK:  Please state your full name and spell

17  your last name for the record.

18          THE WITNESS:  David Robert Morris, M-o-r-r-i-s.

19  DIRECT EXAMINATION

20  BY MR. LEHMAN:

21  Q.  Mr. Morris, just one question:  Did any of the leads that

22  Mr. Shane gave you have emails with them?

23  A.  No.

24          MR. LEHMAN:  Unless your Honor has other questions, I

25  don't have any.

I65KTRET                    Morris – Cross

1          MR. KNOX:  I'll cross, your Honor.

2          THE COURT:  You may.

3    CROSS-EXAMINATION

4    BY MR. KNOX:

5    Q.  Good morning, Mr. Morris.

6    A.  Good morning.

7    Q.  You stated earlier -- strike that.

8          Is it true that you have been in the advertising

9    business for 35 years?

10   A.  I've been in the cruise industry for 35 years.

11   Q.  All right.  And your position, as you sit here, is that

12   Treasure Chest didn't actually perform its duties under the

13   contract, correct?

14   A.  Yes.

15   Q.  And part of that belief is based on the fact that, as you

16   state, A-ROSA Cruise Lines only had one telephone number?

17   A.  Yes.

18   Q.  That number was a unique telephone number, correct?

19   A.  Yes.

20   Q.  Did A-ROSA Cruise Lines also have a website in 2016?

21   A.  Yes.  A North American and a German website.

22   Q.  Did you have any involvement in the creation of the

23   website?

24   A.  Yes.

25   Q.  And did your logo appear on that website?

 1   A.  Yes.

 2           MR. KNOX:  I'm showing the witness what has been

 3   marked as Plaintiff's Exhibit H.

 4           MR. LEHMAN:  Could I please have a copy?

 5           THE COURT:  Please show it to counsel.

 6   BY MR. KNOX:

 7   Q.  Mr. Morris, I ask that you please take a look at it and

 8   look up when you're done.

 9   A.  Okay.

10   Q.  Can you tell me what this is?

11   A.  This is a -- from our website for people wishing to

12   download further information and a digital brochure for A-ROSA

13   cruises.

14   Q.  Okay.  Does Plaintiff's Exhibit H adequately represent what

15   that website showed when a consumer went to the website in

16   2016?

17   A.  Yes.

18           MR. KNOX:  I'd like to move it into evidence, your

19   Honor.

20           MR. LEHMAN:  No objection.

21           THE COURT:  Received.

22           MR. KNOX:  It is Plaintiff's H.

23           (Plaintiff's Exhibit H received in evidence)

24   BY MR. KNOX:

25   Q.  Mr. Morris, would you please look at page 2 of Exhibit H.

I65ktret                    Morris - Redirect

1   There is a telephone number for consumers to contact for A-ROSA

2   cruises, correct?

3   A.  Yes.

4   Q.  Would you please tell us the phone number?

5   A.  (855)55A-ROSA.

6        MR. KNOX:  I'm now showing the witness Plaintiff's

7   Exhibit B, already in evidence.

8   Q.  Mr. Morris, please take a look and look up when you're

9   done.

10  A.  Okay.

11  Q.  That's the insert that was sent -- that David Morris

12  International provided for the emailing campaign, correct?

13  A.  Yes.

14  Q.  Is there a telephone number on that?

15  A.  Yes.

16  Q.  Please tell us the telephone number.

17  A.  (888)372-9995.

18  Q.  Those are two different telephone numbers, correct?

19  A.  Yes.

20       MR. KNOX:  Nothing further, your Honor.

21  REDIRECT EXAMINATION

22  BY MR. LEHMAN:

23  Q.  Mr. Morris, do you think you received any business from the

24  mailing?

25       MR. KNOX:  Object, your Honor; calls for speculation.

1        MR. LEHMAN:  It's what he thinks, your Honor.

2        THE COURT:  It's actually irrelevant because there's

3   nothing in the contract that promises business, but he can

4   answer.

5   BY MR. LEHMAN:

6   Q.  Do you think you received any business from --

7   A.  No, we did not.

8   Q.  Why do you say that?

9   A.  Well, first of all, there was -- in all of the transactions

10  with this company, there was a specific offer made unique to

11  that company and others, four other companies, that they

12  couldn't access through any other mechanism other than this

13  toll-free number, and this particular offer idea was a savings

14  of about a thousand dollars off of the normal price that you

15  would find on the website or anywhere else that they would have

16  to access through this specific phone number.

17       MR. LEHMAN:  No questions, your Honor.

18       MR. KNOX:  Your Honor, at this time, plaintiff would

19  like to renew its motion for a directed verdict.

20       THE COURT:  Why shouldn't I grant the motion?

21       MR. LEHMAN:  There is no evidence that they did weekly

22  digital impressions in this record.  There is none.

23       THE COURT:  You didn't -- he has sworn to it.  He does

24  not need to support everything he says with a document.  That's

25  just not the law.  And you chose not to engage in the targeted

1   document requests that I suggested that you engage in.  You

2   insisted on a trial.  The plaintiff wanted to move for summary

3   judgment.  You did not want summary judgment, you wanted this

4   trial.  You understood the rules of the game.  And it's not

5   defective that he has not brought in all the evidence that

6   might exist to support his sworn statement.

7           MR. LEHMAN:  Your Honor, I understand what you're

8   holding.  The only thing I want to reserve for the appeal is

9   that we did ask for the documents --

10          THE COURT:  You know, your entire motion to preclude

11  totally failed to make reference to any specific document

12  request that you were going to argue form the basis for an

13  earlier disclosure.  Also, your arguments, every one of them,

14  were just totally flawed.  You are arguing about documents that

15  you had received, things that you knew, and --

16          MR. LEHMAN:  Your Honor, we never received those

17  documents.  Mr. Morris and I went through all --

18          THE COURT:  I'm sorry.

19          MR. LEHMAN:  There is no evidence that he received

20  any.  That's why I moved under hearsay.  Those documents were

21  pure hearsay.  There's no evidence that he ever received it.

22          THE COURT:  Those rulings stand.  The affidavit of the

23  plaintiff was totally sufficient in the first place.

24          MR. LEHMAN:  Your Honor, I understand what you're

25  holding.  I just wanted to preserve it.  We, on three

1    occasions, moved to compel discovery, and at the end --

2              THE COURT:  No, our discussions were about the list.

3    Listen, I can understand, based on the conference, that there

4    could be some confusion because, to be perfectly frank, I don't

5    think that Mr. Knox had a total mastery of his client's

6    business, but all of that could have been clarified.  And it

7    wasn't that he didn't tell us the source of the list at the

8    conference, he did, but perhaps not with the kind of conviction

9    that made it clear what it was.  I think it's now totally

10   clear.  And I don't think it matters whether there was

11   information on the list about the wealth of the individuals, it

12   doesn't matter when they last took a trip.  If that's what you

13   wanted to purchase, you should have insisted on that.  You

14   didn't, apparently.  And they did what they promised.

15             There's no guarantee -- you understand that, I know

16   you do, that there's no guarantee that you are going to make

17   money from this.  They did the mailings, they have the receipt.

18   Frankly, the original document argument, it's rarely, rarely

19   even made these days.

20             MR. LEHMAN:  Your Honor, we were entitled, under Rule

21   26(a), to have that company disclose to us at the very

22   beginning of the litigation.  That company --

23             THE COURT:  How do they know that you're going to

24   claim that they simply didn't do the mailings?  How are they

25   supposed to guess that that's the level of nonperformance that

I65ktret                    Morris - Redirect

1   you were going to assert?  And the bottom line is, it doesn't

2   matter if they failed to give you something at the initial

3   stages.  You had every opportunity to ask for it.  I gave you

4   further opportunity.  You turned it down and said, we want to

5   go to trial, because you thought, I guess, that somehow it

6   would be better to have less of a record.  But you just were

7   wrong.

8          MR. LEHMAN:  Well, it wasn't because it was less a

9   record, it was because it was becoming unduly expensive to

10  continually have these meet-and-confers that went nowhere, and

11  they only produced --

12         THE COURT:  I gave you time -- in person, I gave you

13  telephone conference time, and you had every access to me to

14  resolve any problems.  And at that conference, I made specific

15  recommendations to you about targeted discovery.  If you wanted

16  to ask the question, show me the documents that establish that

17  you mailed these, you could have asked for that after that

18  conference, but you asked for a trial.  So, so be it.

19         So, tell me why I shouldn't grant his motion.

20         MR. LEHMAN:  Your Honor --

21         THE COURT:  What part of the contract didn't they

22  perform?

23         MR. LEHMAN:  Using a legitimate database.

24         THE COURT:  Okay.  I think that argument just doesn't

25  cut it when a hotel like the Breakers has used them a dozen

1  times, when Cunard Lines and Princess Cruise Lines are using

2  them.  They are for real.  That's why I asked those questions.

3  This is not fly by night.

4          MR. LEHMAN:  Your Honor, we've asked those questions,

5  also.  We have come across no evidence that they are actually

6  using this company.

7          MR. KNOX:  Your Honor --

8          THE COURT:  Did you take a deposition of the Breakers?

9  Did you take a deposition of Cunard Lines?

10          MR. LEHMAN:  Are you asking me that question?

11          THE COURT:  Yes.

12          MR. LEHMAN:  No, we did not.

13          THE COURT:  All right.  Then his testimony stands,

14  because you're not rebutting it.  No, the plaintiff's motion is

15  granted.

16          We will issue either findings of fact and conclusions

17  of law or a brief decision.

18          MR. KNOX:  Thank you, your Honor.

19          MR. LEHMAN:  Thank you, your Honor.

20                          * * *

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2    Examination of:                              Page

 3    RICHARD FRANKLIN SHANE

 4    Cross By Mr. Lehman  . . . . . . . . . . . . .10

 5    Redirect By Mr. Kadochnikov  . . . . . . . . .27

 6    DAVID ROBERT MORRIS

 7    Direct By Mr. Lehman . . . . . . . . . . . . .30

 8    Cross By Mr. Knox  . . . . . . . . . . . . . .31

 9    Redirect By Mr. Lehman . . . . . . . . . . . .33

10                         PLAINTIFF EXHIBITS

11    Exhibit No.                               Received

12      H   . . . . . . . . . . . . . . . . . . . .32

13

14

15

16

17

18

19

20

21

22

23

24

25
```